FRANCIS ALEXANDRE et al., Respondents, *v.* THE SUN MUTUAL
INSURANCE COMPANY, Appellant.

Under the usual "suing and laboring" clause in a policy of marine insur-
ance, by which the assured agrees to sue, labor and travel in and about
the defence, safeguard and recovery of the property, and the underwriter
agrees to contribute to the charges thereof in proportion to the sum
insured, the latter is not liable for expenses, beyond the amount insured,
incurred for temporary repairs upon the vessel insured in order to make
her seaworthy, she being at the time safe in port. That clause has
reference to charges not covered by the insurance, and does not embrace
expenditures to repair losses caused by the risks insured against.

No liability for a single loss can exceed the amount insured, and such
further expenses as may fall under the "suing and laboring" clause.

Defendant insured plaintiffs' brig against perils of the seas in the sum of
$8,000. The brig sailed from Balize and on the next day was driven on
shore in a gale. She was taken back to Balize, unloaded and found
seriously damaged. The proportion of general average of expenses
incurred in taking the brig back, unloading her and ascertaining extent
of injury, for the brig to pay, was $581.18.

The master wrote to plaintiffs at New York for instructions as to repairs,
estimating temporary repairs at about $2,500. Plaintiffs wrote the
master referring him to a friend at Balize with whom he was to consult,
and stating, whatsoever he and the friend referred to should decide was
approved beforehand. Upon this letter defendant indorsed that, as

underwriters, they concurred therein. Temporary repairs were made at Balize which cost $8,769.74. The brig went to New York and was there repaired in full at a cost of $4,547.71. Defendants paid $8,000. Plaintiffs claimed eight-tenths of the whole amount paid by them.

*Held*, that defendant, in addition to the amount insured, was liable to pay, under the suing and laboring clause, eight-tenths of the $581.18, but as not liable under it for any portion of the excess of repairs. Nor was defendant made liable by its assent to the action of the assured and their agents in reference to repairs; that in expressing its assent "as underwriters" it limited such assent to its liability as such "underwriters," and only thereby waived all technical objections as to the place, extent and cost of the repairs.

The authorities construing the "suing and laboring" clause collated and discussed by HUNT, C.

(Argued May 16, 1872; decided January term, 1873.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial district, in favor of plaintiffs, entered upon order denying a motion for a new trial, and directing a verdict in favor of the plaintiffs. (Reported below, 49 Barb., 475.)

The action was brought on a policy of insurance, issued by the defendant to the plaintiffs, by which an insurance was effected against perils of the seas, to the amount of $8,000, upon their brig E. F. Newton, afterward called the Antonio Mathè, valued at $10,000, for one year from the 11th day of July, 1864, which policy contained the usual suing and laboring clause, to wit : "That in case of any loss or misfortune it should be lawful and necessary to and for the assured, their factors, servants and assigns, to sue, labor and travel in and about the defence, safeguard and recovery of the said vessel, or any part thereof, without prejudice to the insurance made by said policy ; and that the said company would contribute to the charges thereof according to the rate and quantity of the sum insured by said policy."

She sailed from Balize, Honduras, on the 27th day of August, 1864, with a cargo of logwood, mahogany, etc., bound for New York. On the following day she was driven on shore in a gale, on the main reef, near Key Chappell. Two days thereafter she drove over the reef, with loss of fore-foot, and leaking badly.

She then returned to Balize, where the cargo was discharged. Surveys were subsequently held, when it was found that her bottom had been considerably damaged and that she required extensive repairs.

Her cargo could not be brought on in her, and it was sent forward by other vessels.

In taking the brig back from the reef to Balize, unloading her there, taking care of her and her cargo there, and ascertaining the nature and extent of the damage sustained on the reef, and before it was concluded to send forward part of her cargo by another vessel, certain expenses were incurred, specified in a general average statement, the proportion of which applicable to the said brig was $581.18. Temporary repairs were made at Balize at a cost, including the cost of exchange, of $8,769.74, and when she reached New York she was repaired in full at an expense, after deducting one-third new for old, of $4,547.71. The circumstances under which these repairs were made are stated in the opinion of the chief commissioner.

The preliminary proofs of loss and interest were served on the 20th day of May, 1865, and this action was commenced in the following July.

The defendant, after its commencement, paid the plaintiffs the sum of $8,000, the amount insured by it, with interest and costs accrued to that time, and claimed in its answer, and on the trial, that such payment discharged its liability.

The plaintiffs claimed on the trial eight-tenths of the following sums, after deducting the $8,000 paid, viz. :

Vessel's portion of general average ............    $581 18
Temporary repairs .........................    8,769 74
Full repairs ..............................    4,547 21

  Making the aggregate sum of............$13,898 13

The balance claimed was $3,118.51, with interest thereon from June 20th, 1865, amounting to $163.72. At the close of the testimony, the defendant moved for a dismissal of the

complaint on the ground that it appeared by the evidence that the liability of the defendant under the policy had been satisfied. The motion was denied, to which decision the defendant's counsel excepted. The court then directed a verdict for the plaintiff for the full amount claimed by them, viz., the sum of $3,282.23. To this direction the counsel for the defendant excepted.

The jury found a verdict for the amount directed, and the court ordered the exceptions to be heard in the first instance at General Term.

Further facts appear in the opinion.

*Joseph H. Choate* for the appellant. No liability for a single loss can exceed the amount insured, and such further expenses as may fall under the suing and laboring clause. (2 Phillips Ins., § 1743; 3 Kent Com., * 340, and notes; 2 Arnould Ins., * 1193; *Livie* v. *Janson*, 12 East, 647; *Rice* v. *Homer*, 12 Mass., 230; *Knight* v. *Faith*, 15 Q. B., 649; *Barker* v. *Phœnix Ins. Co.*, 8 J. R., 307; *Saltus* v. *Comm. Ins. Co.*, 10 id.; *Le Cheminant* v. *Pearson*, 4 Taunt., 367; *Kermel* v. *La Compagnie Royale d'Assurance, Journal de Cassation*, 1823; 3 Kent Com., 340, note *a*; *Lawrence* v. *Van Horne*, 1 Caines, 276; *Schmidt* v. *United Ins. Co.*, 1 J. R., 249; *Watson* v. *M. Ins. Co.*, 7 id., 57; *Kidstone* v. *Em. M. Ins. Co.*, 1 Eng. L. R., Com. Pleas, 535; S. C., 2 Exq. Cham., 357; *Brooks* v. *Oriental Ins. Co.*, 7 Pick., 259; *Am. Ins. Co.* v. *Center*, 4 Wend., 45, 51.)

*James C. Carter* for the respondents. In case of an ordinary loss the underwriters' liability is usually limited to the amount of subscription, but under the circumstances a larger recovery may be had. (*Livie* v. *Janson*, 12 East, 655; 2 Phillips on Ins., § 1267; Hopkins on Average, 301, *et seq.*; 2 Arnould on Ins., 347 *n*, 348; *Le Cheminant* v. *Pearson*, 4 Taunt., 367; *Barker* v. *Phœnix Ins. Co.*, 8 J. R., 237; *Jumel* v. *M. Ins. Co.*, 7 id., 412; *McBride* v. *M. Ins. Co.*, id., 431; *Watson* v. *M. Ins. Co.*, id., 57; Arnould on Ins.

[4th Eng. ed.], 744, 745; Phillips on Ins., §§ 1355, 1268.) The "sue, labor and travel" clause applies to any loss or misfortune, and charges the underwriter with his proportionate share of expense incurred thereunder. (*Kidstone* v. *Em. M. Ins Co.*, 1 L. R. C. P., 535; S. C. in Ex. Ch., 2 id., 357; Phil. on Ins., § 43; Arn. on Ins., 36.) The separation of the cargo defendant was apprized of and assented to, and cannot now take advantage of it. (*Potter* v. *Ocean Ins. Co.*, 3 Sumner, 127; 2 Phil. on Ins., § 1274.)

LOTT, Ch. C. The plaintiffs recovered upwards of $3,000 beyond the amount insured by their policy of insurance, and the exceptions taken by the defendant at the trial present the question whether any portion of that excess was properly chargeable to and recoverable against it. It now concedes its liability on account thereof to the amount of four-fifths of $581.18, the vessel's proportion of general average expenses shown to have been properly incurred and admitted to be chargeable to it under what is called the "suing and laboring" clause in the policy. The plaintiffs claim that the same clause makes it liable for the residue of such excess, which was allowed for repairs to the vessel after she returned to Balize. It therefore becomes material to refer to its terms. It provided that in case of any loss or misfortune it should be lawful and necessary to and for the insured, their factors, servants and assigns, to sue, labor and travel in and about the defence, safeguard and recovery of the said vessel or any part thereof, without prejudice to the insurance made by said policy; and that the said company would contribute to the charges thereof, according to the rate and quantity of the sum insured by said policy.

That provision has reference to charges not covered by the insurance, and does not embrace losses caused by damage to the property insured. Its object was to secure diligence in its preservation and protection, and thereby prevent a loss or reduce its amount, and to provide compensation for the labor done and expenses incurred in accomplishing that end.

It has application in the present case only to the general average expenses that had been incurred. The subsequent expenditures were made to repair damages caused by the risks insured against, and were clearly payable under the insuring clause. They, consequently, do not come within the terms or meaning of the agreement "to sue, labor and travel" for the benefit of the property insured. The two provisions, as I have stated, relate to different subjects, and the right to compensation and payment under one of them necessarily excludes a right to a claim or demand under the other.

The views above expressed lead me to the conclusion that no portion of the cost of repairs above the sum insured was recoverable under the suing and laboring clause, and also show that the claim, on behalf of the plaintiffs, that they could, independent of that clause, recover such excess of repairs, on the ground that the underwriter was liable upon the general principles of the contract of insurance to pay for expenditures incurred to prevent or diminish the extent of loss, is unfounded. No such expense was in fact incurred, or, at least, beyond that of a general average character, admitted by the defendant to be chargeable as before stated. It then remains to be considered whether the recovery of such excess can be sustained on any other ground. It is claimed by the plaintiffs that the defendant is bound by a special agreement to pay it, and that was the ground on which the General Term placed their decision in ordering judgment on the verdict.

I cannot concur in that conclusion. When the vessel returned to Balize it was ascertained that she required extensive repairs, and the master thereupon wrote and sent a letter to the plaintiffs informing them of the nature and extent of the damages, the heavy expense that would be necessary to be incurred in making such repairs and the inefficiency with which the work would be performed; and after making the suggestion that she might, after making certain repairs, pro-

ceed to New York with safety for full repairs, he asks for their instruction.

On the receipt of this letter by the plaintiffs they took it to the defendant and consulted it as to what should be done, and it was determined that the vessel should be temporarily repaired at Balize and sent to New York for permanent repairs. The defendant requested the plaintiffs to write to the master and instruct him in the premises. They thereupon wrote him a letter on the fourth day of November, 1864, which (so far as it is material to ascertain the instructions given) contains the following directions:

"We have consulted with the underwriters and they leave the matter in our own hands. We, therefore, request you to consult with our friend Anto. Mathè in all matters concerning the brig. We wish to put only such repairs as will be considered perfectly safe to bring the brig to this port. * * * In a word, whatever you and Mr. Mathè decide about the brig is approved beforehand."

This letter, before being forwarded, was exhibited to the defendant, and it wrote at the foot thereof as follows:

"OFFICE SUN MUTUAL INS. CO., ⎱
          *November 4,* 1864.      ⎰

"We, as the underwriters on the hull of brig Anto. Mathè, concur in the above.

          "E. R. ANTHONY,
               " *Vice-President.*"

This is a mere assent to such action as the assured might deem it advisable to take in reference to the matter. At that time the expense of the necessary temporary repairs at Balize had been estimated by a master shipwright at $1,500, and it was the opinion of another that $2,500 would be nearer the amount, and the general tenor of the master's letter indicates his opinion that they would not much, if at all, exceed that sum, and that it would be for the interest of all parties to have those made and postpone the making of full repairs till the arrival of the vessel at New York; but he does not sug-

gest that it could not be fully repaired at Balize, or that the damage was so great as to justify an abandonment. Under such circumstances the plaintiffs, as owners, and the underwriter had mutual rights and interests to be protected, and it was very proper, if not in fact necessary, that the latter should be consulted in reference to the repairs to be made, and particularly whether the entire or only a partial expenditure therefor should be made at Balize. There was nothing said by the plaintiffs to the defendant giving color to the idea or suggestion that the latter was to assume the responsibility of the entire cost, or that it was to be held liable beyond the amount of the sum insured by it, and it in expressing its concurrence in the instructions given by the plaintiffs to the master declared it to be given "as underwriters," clearly intending to limit or qualify its assent by the nature of its liability as such "*underwriters*," and to that extent only, and not to change its relation to the vessel or owners.

Nothing was said by it to warrant the inference that it made or intended to make the master its agent in procuring the repairs to be made.

Its liability under the terms of its policy to contribute to the loss to the extent of the amount of its subscription or sum insured by it made it its interest to have the repairs made on as reasonable terms as possible, and it was important to the plaintiffs, who had to bear the residue of such loss, not only that the expenses incurred therefor should be reasonable, but that there should be no question made after they had been incurred in reference to the amount thereof. It was, therefore, well and provident that there should be a consultation and an agreement on the subject before any expenditures were made.

It may also be added that although it is said in the statement of facts read on the trial, and which had been previously agreed upon as correct by the counsel of both parties, that the repairs which on the survey of the vessel were found to be necessary, "could not be done where she lay at Balize,"

it is evident from the letter of the master that such was not his understanding nor the result of his information at the time he wrote it, but that his advice or opinion in regard to the propriety of only making temporary repairs there was based on the extravagant charges that would be made, and that the work would not be as well or efficiently performed as at New York, and it may have been doubted whether in that case they would have been justified in making temporary or partial repairs only at that port, and the consultation by them with the defendant in reference thereto, and its concurrence in the directions that might be given by them to the master, may have been deemed necessary. Such action was prudent and in the exercise of a proper precaution against subsequent difficulties, but it did not change or in any way affect the relative rights or liabilities of the parties.

It follows that the defendant cannot be charged or held liable on the ground that it had entered into a special agreement to pay those expenditures, and the court below erred in holding that such a liability existed.

There must, therefore, be a reversal of the judgment appealed from, unless the plaintiffs consent within twenty days after notice of filing the remittitur in the Supreme Court to the reduction of their verdict and judgment to four-fifths of $581.18, the vessel's proportion of the general average expenses, with interest thereon from 20th June, 1865.

If such consent is given, then the judgment is affirmed for that sum, with such interest thereon. If such consent is not given, then the judgment must be reversed and a new trial ordered. No costs in either case are given to either party on the appeal to this court.

HUNT, C. The defendant has paid the sum of $8,000, the amount specified in the policy, and denies its further liability. The question is whether, by virtue of the policy simply, or in consequence of the clause authorizing the insured to sue and labor, or in consequence of the corre-

spondence which occurred, the defendant is liable beyond the amount underwritten by it upon the brig.

The clause referred to made it "lawful and necessary for the assured, their factors, servants and assigns, to sue, labor and travel in and about the defence, safeguard and recovery of the said vessel, or any part thereof, without prejudice to the insurance made by said policy; and that the said company would contribute to the charge thereof according to the rate and quantity of the sum insured by the said policy."

The object of this clause is said, by Arnould, to be to permit the assured to take every measure for the recovery of the property without waiving his right of abandonment, and to bind the underwriters to contribute to reimburse the expenses incurred. Although the language of the clause is permissive only, it is well settled that it is the clear duty of the assured so to labor for the recovery and restitution of the property. (1 Arnould on Ins., § 29.)

The objection is made in the outset that the policy is an instrument of indemnity to a certain amount, and that no liability for a single loss can exceed that amount, and such further expenses as may fall under the suing and laboring clause. Although it is generally true that the liability of the underwriter is limited to the amount of his subscription, there are many instances given in the books where a greater liability is incurred. In *Livie* v. *Janson*, Lord ELLEN-BOROUGH said: "There may be cases in which, though a prior damage be followed by a total loss, the assured may have rights or claims in respect of the prior loss which may not be extinguished by the subsequent total loss. Actual disbursements for repairs, in fact, made in consequence of injuries by perils of the seas, prior to the happening of the total loss, are of this description." * * * (12 East R., 655.)

Phillips says: "In England and the United States the underwriters are unquestionably liable for a subsequent total loss, in addition to the expense of previous repairs, which have been previously paid for by the assured, in distinction

from those made by means of funds raised on bottomry. That is, the insurer is liable for the expense of the repairs; and is also liable for subsequent damage to the repaired parts of the ship." (2 Phil. on Ins., § 1267.) These authorities do not conflict with the appellant's position, as in the cases put there are successive losses, while the appellant's proportion is limited to the case of a single loss. In respect to this item of $581.18 general average, in getting off the vessel and running her to the Balize, the authorities are clear that it is a proper charge upon the underwriters in addition to their subscription, although there was but a single loss. The expenses of salvors and lighters must be paid at all events; and this, whether anything is saved or not, and although they may swell the loss to an amount greater than the sum insured.

In *Jumel* v. *The Marine Ins. Co.* (7 J. R., 412) it was held that the insured were entitled to recover as for a total loss, and also for all the subsequent expenses in endeavoring to save the property. (See, also, *McBride* v. *The Same*, id., 430; *Watson* v. *The Same*, id., 57.)

Taking the policy, with the laboring clause included, and it is not denied by either party that certain sums beyond the amount underwritten may be recovered. The contention is as to the extent of such recovery. Can an expenditure intended for temporary repairs, increased by the difference of exchange and the high price of labor (as it is stated in the briefs) to the sum of $8,769.76, while the permanent repairs of the vessel when she reached New York were made at an expense of $4,547.21, be recovered against the underwriter? I suppose the amount of the expense cannot determine the question. It is, perhaps, not an element in the case, but I state the fact as it exists in the present case. If a recovery can be had against the underwriters, the rule governing the amount is declared to be "according to the rate and quantity of the sum insured by said policy." The vessel being valued at $10,000 and the sum insured being $8,000, the rate and quantity of the sum insured is eight-tenths. This proportion,

therefore, of. the expenses of the temporary repairs, if any, would fall upon the underwriters.

By the clause quoted there are three purposes for which the assured is authorized and required to sue, labor and travel, viz.: 1, the defence; 2, the safeguard; and 3, the recovery of the vessel. In the cases against the marine insurance company, above cited from Johnson's Reports, the vessels had been seized by hostile persons and condemned as prizes. The expenses for which the underwriters were held liable were those incurred in endeavoring to defend the rights of the owners in the courts of law. They were expenses incurred in the safeguard or in the recovery of the vessel. Either term would cover them.

In *Kidstone* v. *The Empire Mar. Ins. Co.* (Law Rep., 1 Com. Pleas, 535) the plaintiff had effected a policy on the charter freight of guano, from Chincha island to Great Britain. The vessel encountered a storm and put into Rio, so damaged by the perils of the seas as not to be worth repairing, and was sold. The guano was landed and stored at Rio, and the master procured another vessel to carry it to Bristol at an agreed freight of £2,400, which the plaintiffs paid, and received the freight from the consignee. An expense of £100 was also incurred at Rio in landing, storing and reloading the guano. It was held that the plaintiffs are entitled to recover, under the suing and laboring clause, the expenses so incurred and the freight of £2,400, notwitstanding there had been no abandonment. Two principal considerations controlled the decision of this case. First, the freight insured would have been totally lost, unless the expenses had been incurred. It was not due until and upon the delivery of the cargo in Great Britain. Stopping at Rio, no part of it was due *pro rata itineris*. When the loss occurred, the master was authorized to procure another vessel and forward the cargo, and when thus forwarded he would be entitled to the freight. While the cargo remained in Rio, the subject of the insurance was entirely lost. The additional expense was incurred in the safeguard and recovery of the subject insured, and hence it was held to be

within the clause we are considering.   It may be observed, in passing, that the amount insured upon the charter freight was £2,000 while the sum thus expended in the safeguard and recovery of the freight was over £2,500.   The second important decision in the case was, that it was not necessary that an abandonment should have taken place, by which the property would become substantially that of the underwriter.   The learned judge says: " The meaning is obvious, that if an occasion should occur in which, by reason of a peril insured against, unusual labor and expense are rendered necessary to prevent a loss for which the underwriter would be answerable, and such labor and expense is incurred accordingly, the underwriters will contribute not as a part of the sum insured in case of loss or damage, because it may be that a loss or damage for which they would be liable is averted by the labor bestowed, but as a contribution on their part as persons who have avoided detriment by the result, in proportion to what they would have had to pay if such detriment had come to a head for want of timely care.   *   *   In this case there is no abandonment and may be no prospect of one; and yet it is the duty of the master to use all reasonable means to preserve the goods, and obviously for the interest of the underwriters to encourage him in the performance of that duty by contributing to the expenses incurred." (Id., 543.)   This case was affirmed upon appeal to the Exchequer Chamber upon substantially the same grounds on which it was placed in the Common Pleas.   (2 Law Rep. Com. Pleas, 357.)   This case is a clear authority that the plaintiffs' rights in the case before us are not prejudiced by the non-existence of an abandonment.   On the other branch of the case the authority is not so strong.   The vessel was in port at Balize.   The general average expenses of $581 had been incurred, for which the defendant is responsible.   There she was, and such as she was, her owners, had, and could use her in their discretion. It was not like the case of the freight which required an expenditure to give it an actual existence.   The vessel was present in port, physically.   How much she was worth there

before the repairs, or how much she was worth there after the repairs, does not appear. Nor does it appear whether she was worth more or less there than in New York. But she was there and had some value. I do not see how it can be said that the repairs at Balize were about the "defence, safeguard or recovery" of the vessel. She needed no defence or safeguard. She was quietly in the port of a friendly nation. She was safe from storms or perils, nor was any expense needed or incurred for her recovery. She was in the master's hands, and no one proposed to interfere with her. Although she would not have been safe at sea, she was safe in port. Expenses for the safeguard of a ship cannot properly be said to be those by which she is put in a condition of seaworthiness. The two ideas are essentially different. The sum of $8,769, spent at Balize, was for the improvement of the vessel, rather than for her safeguard, defence or recovery.

Phillips lays down the general rule that "An aggregate of losses exceeding the amount of the insurable interest of the subject on the policy is most frequent in cases of general average and total loss." (Phil., § 1268.) For this he cites the cases in Johnson which I have above referred to, and the present case when decided in the court below.

*The Great Indian Peninsula Railway Co.* v. *Saunders* is frequently referred to. (1 Best & Smith, 101 Eng. C. L. Rep., 41; affirmed [2 B. & S.], 110 id., 266.) In that case the policy was with the warranty "free from particular average, unless the sloop be stranded, sunk or burnt;" and it was upon the effect of this warranty that the chief discussion arose. The plaintiff procured an insurance upon 1,995 bars of railway iron to Bombay by a policy, with this condition underwritten. It was held that this was a stipulation against total loss and general average only. The ship experienced such heavy gales that she was obliged to put into Plymouth, and was unable to proceed. The plaintiff shipped his rails by another vessel at an advanced price, and this he sought to recover from the defendants. The ship was neither stranded, sunk or burnt, and it was held that he could not recover,

although there was, constructively, a total loss of the ship. The court say, in closing : " It was, however, further argued by Mr. James that the plaintiff was entitled to recover under the clause which authorizes the insured to sue and labor for the preservation of the subject-matter of the insurance. It is not necessary to decide whether an underwriter on a policy against a total loss only is, under this clause, liable for expenses incurred by the assured for the purpose of rescuing the subject-matter of an insurance from a state of peril which might have resulted in a total loss, but did not. There are reasons for and against this stated by Mr. Phillips in his treatise on Insurance (§ 1777), and the question seems never to have been actually decided ; but in the present case it does not arise. The expenses here were incurred in forwarding the subject-matter of insurance to its destination at a time when the iron was not in any peril of a total loss, either actual or constructive."

The authority of this case is against the plaintiffs, as far as it is authority, but it is so different in its facts that it can scarcely be called an authority.

Upon an examination of all the cases to which attention has been called, I have not been able to find any that would authorize this recovery ; nor do I think it comes within the spirit of the contract. Had full repairs been made at Balize the defendant would have been liable for them only to the amount of its insurance. The repairs were made for the improvement of the vessel, and these, it has been held, are not within the suing and laboring clause. The expenses were not incurred for the defence, safeguard or recovery of the property. There was no impending disaster against which they formed a protection. In my opinion, neither upon this clause nor upon the general terms of the policy, can the claim of the plaintiffs be sustained.

The question remains, whether the defendant altered its position by what took place on the fourth of November, 1864. About the 30th of August, the vessel had been got off from the rocks and taken into Balize. It was found upon examin-

ation that she required extensive repairs. Such repairs could not well be done where she lay at Balize. On the 7th of October, the master wrote to the plaintiffs that the vessel could get to some other southern port with very slight repairs; that the southern ports were closed, except Havana, which was too expensive, and that the work on the vessel was stopped. He gave an estimate of one mechanic for the repairs at $1,500 and another of $2,500, stating some particulars of the damage and his own idea of what repairs would be necessary to carry her to New York. On the receipt of this letter, it was taken to the defendant, a consultation was had, and "it was determined that the vessel should be temporarily repaired at Balize, and sent to New York for permanent repairs." The plaintiffs thereupon wrote to the master on the 4th of November, to the effect that the underwriters had left the matter in their hands, and they requested him to consult with their friend Antonio Mathè. "We wish you to put only such repairs as will be considered *perfectly* safe to bring the brig to this port.  *  *  In a word, whatever you and Mr. Mathè decide about the brig is approved beforehand." Upon this letter the defendant wrote as follows: "We, as underwriters on the hull of the brig Anto. Mathè, concur in the above. E. R. Anthony, Vice-President."

By this agreement, did the parties to it understand that the defendant consented to contingent increase of its liabilities, that it consented to assume responsibilities not then resting upon it, or was it a waiver of objections that might be made as to the time, place or circumstances in which its liability, as it then existed, might be reduced to form and shape? Both parties are assumed to have known the general principles governing the defendant's liability. Such no doubt was the case in fact. Those principles are as follows:

1. That the underwriter was liable for the proportion of the general average expenses in getting the vessel off from the rocks into the Balize.

2. That if she proved to be damaged to more than half her

value, the owners might abandon, and the liability for $8,000 would at once attach.

3. That if damaged to less than that extent, and repairs were put upon her where she lay, the underwriters would be liable for eight-tenths of such repairs, provided it came within the limit of $8,000.

This was the precise condition, and these are the precise obligations of the parties. With these views in their minds, the plaintiffs authorize the master to make such repairs as would bring the brig in safety to New York. The master was in perplexity; should he have the vessel repaired at Balize, or should he take her to Havana? If the expenses are enormously large at Balize, and they were there incurred, would the underwriters be responsible? Should he risk a trip to New York on slight repairs, what would be for the interest of the owners? To relieve him the plaintiffs direct him to make the repairs at Balize, and the defendant concurs in the direction. They authorize him, in conjunction with Mr. Mathè, to act as his judgment shall determine.

Under this authority the master might have abandoned, if the facts were such as to justify it. He chose to make repairs. I cannot think that, in adopting either course, the legal relation of the parties was or could be altered thereby. The plaintiffs were still the party assured, the defendant was still the underwriter. The obligations connected with this relation remained as before. The details of the evidence by which to fix the liability are in some respects altered. The defendant would not be at liberty to say that repairs should not have been made in a port so expensive or to so great an extent; it could not challenge items. It could not insist that there should or should not have been an abandonment. It had authorized the master and Mr. Mathè to decide those questions, and must submit to their judgment. But it did not authorize any alteration of its relations with the plaintiffs; nor did it give the slightest intimation that it was willing to assume any new obligations. It was a liberal, courteous waiver of all technical objections that

might arise, which it is unreasonable to attempt to wrest to its injury. It was as if it had said: "We are liable for eight-tenths of the repairs, not exceeding $8,000. We are liable for that amount if there is a total loss. You have an agent and a friend on the spot, who are sensible men. We are content that they should decide what had better be done, and we will pay according to our liability on these principles." This is the essence of the authority, and I can find in it no warrant for the judgment rendered.

Upon the whole case, I think, judgment must be reversed, and a new trial ordered.

All concur.

Judgment in accordance with opinion of LOTT, Ch. C.